1  William M. Smith
   SID. #6978452 / EOCI
2  2500 Westgate
   Pendleton, OR 97801
3
   Pro Se
4

5

8  WILLIAM M. SMITH,                              )
                                                  )    Case No.:  2:20-cv-01091-YY
9              Plaintiff,                         )
                                                  )    COMPLAINT
10      v.                                        )
                                                  )    TITLE 42 § 1983
11 R. CONLEY, Individually and in his official    )
   capacity as the Medical Services Manager at    )    JURY TRIAL DEMANDED
12 at Eastern Oregon Correctional Institution; and, )
   E. PURCELL, Individually and in her            )
13 official capacity as the Nurse Manager at the  )
   Eastern Oregon Correctional Institution; and,  )
14 LELAND BEAMER, Individually and in his         )
   formal official capacity as a Doctor at Eastern )
15 Oregon Correctional Institution; and,          )
   MS. ASTORGA, Individually and in her           )
16 official capacity as a Nurse Practitioner at   )
   Eastern Oregon Correctional Institution; and   )
17 CHRISTOPHER DIGIULIO, Individually and         )
   in his official capacity as Medical Director of )
18 the Oregon Department of Corrections; and,     )
   DR. DEWSNUP, Individually and in his           )
19 official capacity as a medical specialist at   )
   Eastern Oregon Correctional Institution; and,  )
20 MS. DAVIES, Individually and in her official   )
   capacity as a nurse practitioner at Eastern    )
21 Oregon Correctional Institution; and,          )
   NINA SOBOTTA, Individually and in her          )
22 official capacity as the Grievance Coordinator )
   at Eastern Oregon Correctional Institution; and, )
23 SERGEANT JOHN DOE I, Individually and in       )
   his official capacity as a Security Sergeant at )
24 Eastern Oregon Correctional Institution; and,  )

1 C.O. JOHN DOE II, Individually and in his )
official capacity as a Correctional Officer at )
2 Eastern Oregon Correctional Institution. )
)
3                Defendants. )

4       Plaintiff is a state prisoner currently incarcerated at the Eastern Oregon Correctional

5 Institution (EOCI). Plaintiff has previously filed nine civil complaints in United States District

6 Court for the District of Oregon. Smith v. Maass, et al., was filed in approximately 1991-92,

7 addressing due process violations within a prison disciplinary hearing. Defendant's motion for

8 summary judgment was granted in 1993. Plaintiff filed appeal to the U.S. Court of Appeals for

9 the Ninth Circuit where the District Court's decision was affirmed. Plaintiff filed his second

10 complaint, William M. Smith v. Baldwin, et al., in approximately 1993-94, alleging retaliatory

11 harassment by prison staff and forced exposure to environmental tobacco smoke. Plaintiff was

12 subsequently moved to a non-smoking institution and voluntarily dismissed the complaint.

13 Plaintiff's third complaint; Fred Everts, James Amos, and William M. Smith v. John Kitzhaber,

14 et al., was filed in approximately 1995-96, challenged the constitutionality of Oregon's sex

15 offender notification law. The complaint was dismissed on defendant's motion for summary

16 judgment on the grounds that plaintiff's claims were not yet ripe. The dismissal was without

17 prejudice and leave to refile granted when the issue was ripe. Plaintiff filed his fourth complaint,

18 William M. Smith v. Stacey Dodd, et al., in 1996, after being physically assaulted by corrections

19 staff. Plaintiff's fifth complaint, William M. Smith v. Hardy Myers, et al., was filed in 2001, and

20 addressed several First, Eighth, and Fourteenth Amendment violations. Plaintiff's claims were

21 dismissed and plaintiff appealed to the U.S. Court of Appeals for the ninth Circuit. The case was

22 remanded back to the district court for further proceedings. Plaintiff filed his sixth complaint in

23 2005, alleging the application of unconstitutional parole conditions and that Yamhill County

24 officials were maintaining and using false information against plaintiff. The complaint was

1  dismissed in 2007 as not being timely filed. Plaintiff's seventh complaint, William M. Smith v.

2  Jody Germond, et al., was filed in 2011, alleging unlawful billing practices by Polk County

3  officials. The complaint was voluntarily dismissed after the parties settled the claim. Plaintiff's

4  eighth complaint, William M. Smith v. Dave G. Powell, was filed in 2014, and alleged due

5  process violations in a prison disciplinary hearing and the infliction of cruel and unusual

6  punishment. Plaintiff's claims were dismissed and plaintiff filed appeal to the U.S. Court of

7  Appeals for the Ninth Circuit where the decision of the district court was affirmed. Plaintiff's

8  ninth complaint, William M. Smith v. Ron Miles was filed in 2019, and alleges retaliatory

9  harassment against prison officials for firing plaintiff from his job as an administrative clerk for

10 assisting another inmate in filing a federal lawsuit against prison administrators - this action is

11 still pending in U.S. District Court. Plaintiff's second, fourth and fifth complaints were

12 voluntarily dismissed by plaintiff with leave requested and granted to refile the complaint's after

13 plaintiff's release from prison and establishment within the community. Plaintiff has not had the

14 opportunity to refile any of the complaints. Plaintiff has never had any complaint dismissed as

15 being frivolous or without merit. No further information is available on plaintiff's previous

16 complaints.

17       Plaintiff exhausted administrative remedy on all claims presented in this complaint by

18 filing numerous institutional grievances on the issues presented in the complaint.

19                              PRELIMINARY STATEMENT

20       This is a civil rights action filed by William M. Smith, SID. #6978452, a state prisoner

21 currently held at the Eastern Oregon Correctional Institution (EOCI) in Pendleton, Oregon.

22 Plaintiff alleges violations of the Eighth and First Amendments to the United States Constitution.

23       Plaintiff alleges a variety of Eighth Amendment claims all stemming from the actions of

24 EOCI health services staff which have harmed plaintiff in a variety of ways. Plaintiff further

1 alleges a First Amendment violation of being denied access to the courts against defendant

2 Sobotta. For several years plaintiff has suffered from Chronic Kidney Disease (CKD) which is

3 attributable to several different causes. Defendants with-held knowledge of plaintiff's CKD, from

4 plaintiff, thereby denying plaintiff the opportunity to make appropriate lifestyle changes in diet

5 and exercise which could have slowed the diseases progression. Keeping this knowledge from

6 plaintiff further harmed plaintiff in that plaintiff continued to ingest the drug Prilosec (generic –

7 Omeprazole) which has been shown to exacerbate kidney failure in people with CKD, the drug is

8 clearly contraindicated on the manufacturers website for people with CKD. As a direct result of

9 defendant's actions, plaintiff's CKD continued to grow worse, and did so at an increased rate.

10 Plaintiff first requested to be taken off Prilosec/Omeprazole in approximately October/November

11 of 2017, after hearing on a television news broadcast, that tests had shown Prilosec/Omprazole to

12 accelerate the decline of kidney function in individuals with CKD, and had in some cases caused

13 complete renal failure, particularly in individuals who had been taking the drug long term. At the

14 time plaintiff first requested to be taken off Prilosec/Omprazole (2017), plaintiff had been taking

15 the drug continuously for over 12 years. Dr. Beamer refused to take plaintiff off the drug, telling

16 plaintiff that there was no evidence to support plaintiff's claims that the drug was harmful to

17 kidney function. Plaintiff who suffers from severe acid re-flux disease and heartburn, stopped

18 taking the drug in spite of Dr. Beamer's advice, but soon found he was unable to eat without it.

19 Defendants gave plaintiff no reasonable alternative choice so plaintiff had to resume taking the

20 drug, consequently plaintiff's kidney function continued to decrease at an accelerated rate.

21        In December 2018, plaintiff was assaulted on his prison housing unit. The assault

22 involved a single punch commonly known as a "sucker punch" in which plaintiff did not even

23 see that the punch was thrown. The punch knocked two of plaintiff's teeth out, tore his upper lip

24 in half, and completely tore the right hemisphere of plaintiff's brain loose from the inside of his

1 skull. Plaintiff requested immediate medical attention but security staff refused to contact

2 medical. Instead plaintiff was sent to the East Sergeant's Office. Plaintiff again requested medical

3 attention, and was again denied. Instead, plaintiff was interrogated by the on duty Sergeant as to

4 who had assaulted him. Plaintiff informed the Sergeant that he was merely requesting medical

5 attention, that he had done nothing wrong and was the victim of a unilateral assault. Plaintiff

6 expressly told the Sergeant that he was badly injured and that he felt his brain "sloshing around"

7 the inside of his skull. The Sergeant told plaintiff that if plaintiff refused to "snitch" on the

8 inmate who had assaulted him, plaintiff would not receive medical care and would instead be

9 placed in the disciplinary segregation unit. Plaintiff further told the Sergeant that if he wanted to

10 know who had committed the assault that the Sergeant should stop being lazy and look at the

11 housing unit's video camera footage. Plaintiff whose upper lip was completely ripped in half,

12 was required to wait until the Sergeant was able to identify the assailant. Plaintiff was further

13 told that if he withheld positive identification of his assailant he would be going to the

14 disciplinary segregation unit instead of going to health services for needed medical treatment.

15 Plaintiff was then escorted to EOCI's health services. Plaintiff's injuries were so severe that he

16 was taken to St. Anthony's hospital in Pendleton, Oregon, where plaintiff received stitches to

17 repair his lip. When plaintiff initially explained his injury to medical staff at EOCI, plaintiff

18 informed them that he had felt his brain "moving" and "sloshing around" inside his skull and was

19 experiencing a constant headache and ringing sound. Plaintiff expressly requested an MRI of his

20 brain. Plaintiff repeated this information to both the nurse and the doctor at St. Anthony's while

21 also telling the staff that the punch had enough force to spin plaintiff, who weighed 220 lbs., and

22 was standing flatfooted, completely around, 180 degrees. Shortly after returning from the

23 hospital plaintiff began experiencing a multitude of problems which included a loss of balance,

24 coordination, and core strength, which were combined with memory and cognition problems.

1  Within a week plaintiff's headache grew worse and plaintiff began having trouble walking. In

2  addition to balance and walking difficulties plaintiff was unable to stop himself once he began

3  walking. Initially, stopping himself required that plaintiff grab onto something solid, such as a

4  wall, door handle, or railing. Plaintiff, who is not a doctor, and who had never experienced such

5  symptoms, hoped they would resolve on their own – they did not. The problems grew worse,

6  plaintiff's constant headaches became severe, sometimes progressing to migraine strength.[1]

7  Plaintiff had his unit officer call Health Services to request emergency treatment and was told to

8  submit a request to go to sick call, which plaintiff did. At sick call plaintiff requested a brain

9  MRI because he was experiencing severe neurological problems which plaintiff described to the

10  nurse, pointing out that plaintiff was also falling down on occasion because he could not control

11  his body. The nurse at sick call did nothing and merely put in a referral for plaintiff to see a nurse

12  practitioner. The following week when  plaintiff saw nurse practitioner Astorga, his symptoms

13  had become even worse. Plaintiff complained to defendant Astorga, stating that there was

14  something seriously wrong with his brain, and that plaintiff needed an MRI. The nurse

15  practitioner, defendant Astorga, gave plaintiff some migraine headache medication and told

16  plaintiff that his severe neurological problems were likely being caused by a sinus cold and that

17  she would see him again in a month. During the following month plaintiff began falling down at

18  a far greater rate of frequency, usually several times each day. During this time period plaintiff

19  estimates that he fell approximately 150 times. Several times plaintiff fell on the steel stairs, or

20  the concrete/asphalt in the East Compound. Plaintiff fell over while standing still dozens of times

21  and fell off the edge of his bunk while sitting, dozens of times. On one occasion plaintiff fell on

22  the concrete compound and was unable to get up of his own volition and had to be placed in a

23  _____

[1]  In plaintiff's case he had to suffer through the headaches which were occasionally so severe plaintiff would be
      completely incapacitated and not even able to get up off his bed. Due to plaintiff's Chronic Kidney Disease and

24    low kidney function, he was not able to take any of the normal OTC headache medicines that were readily
      available, medications such as aspirin, Tylenol, or Ibuprofen.

1  wheelchair and taken to medical. On another occasion plaintiff fell on the stairs, free-falling

2  headfirst towards the landing below, however plaintiff was able to grab the railing near the

3  bottom and catch himself.[2] During this month plaintiff frequently found himself standing or

4  walking in the housing unit with no memory of what he was doing. Plaintiff was unable to watch

5  TV because he could not remember the plot of what he had just watched. When writing letters

6  plaintiff had to re-read each line that was just written, so he could remember what he had just

7  written. Plaintiff's handwriting, which was normally very clear and neat, became barely legible.

8  After suffering in this fashion for over two months, plaintiff was finally sent out to Saint

9  Anthony's hospital in Pendleton, Oregon, for a Magnetic Resonance Imaging (MRI) of his brain.

10 Upon review of the MRI, a CAT scan was also ordered. Upon review of the CAT scan plaintiff

11 was immediately admitted into the hospital. Plaintiff was then transported via ambulance to

12 Kadlec Medical Center in Richland, Washington, was admitted into the intensive care unit

13 (ICU), and then underwent emergency brain surgery the following morning. Kadlec neurologist,

14 Dr. Beiber, informed plaintiff that plaintiff's brain had been torn completely loose from the

15 inside of his skull, and that plaintiff's brain had been slowly bleeding continuously since the time

16 of plaintiff's assault 74 days earlier. The neurologist informed plaintiff that there was

17 approximately twenty ounces of blood, in various stages of coagulation on the right side of

18 plaintiff's skull and that the pressure on plaintiff's brain, which was essentially floating freely in

19 the blood, had displaced the right brain hemisphere approximately once inch to the left, smashing

20 it into the left brain hemisphere. The neurologist asked plaintiff why there had been no MRI

21 done at the time of the assault, stating that an MRI should have been done because a diagnostic

22 MRI was the standard of care for any severe head trauma. Plaintiff informed Dr. Beiber of the

23 _____

24 2  Had plaintiff not done this, plaintiff might have fractured his skull, or broken his neck, or possibly suffered a
   fatal injury. Even catching himself as he did, plaintiff tore the tendons or ligaments in his shoulder, and still
   suffers to this day from a painful torn rotator cup in his right shoulder.

1  answer that he had been given by Dr. Leland Beamer at EOCI, who stated that no MRI was done

2  because the TLC committee at EOCI had refused to approve the cost of an MRI.[3] During the two

3  and one-half month period prior to plaintiff's surgery, the EOCI Health services staff had refused

4  to provide plaintiff with the proper hypertension medication needed to adequately control

5  plaintiff's hypertension. Dr. Beiber also told plaintiff that the prison's failure to adequately

6  control plaintiff's hypertension likely facilitated or was at least, a contributing factor, to plaintiff's

7  74 day brain bleed. After surgery plaintiff had to remain in the ICU for several days while while

8  a tube, which had been inserted into plaintiff's skull, allowed his brain to continue draining

9  blood. Plaintiff underwent numerous CAT scans, and was required to undergo rehabilitation

10  therapy where plaintiff learned to walk again, and underwent therapy to realign plaintiff's optical

11  nerves with each hemisphere of his brain. Plaintiff was told by Dr. Beiber that the right

12  hemisphere of his brain would also be "fragile", and prone to further serious injury if he received

13  further blows or injuries to the skull. Plaintiff has also suffered minor  damage which to date

14  appears permanent. This damage includes slowed cognitive processing, memory problems,

15  minor balancing problems, and upon waking severe balance and coordination problems for

16  approximately two to five minutes.

17          In October of 2019, plaintiff was taken to Walla Walla, Washington, to see Dr.  Sislow, a

18  Urologist, for a follow up PSA test and exam. During this visit Dr. Sislow told plaintiff that he

19  had seen on plaintiff's chart that plaintiff had been taking the drug Prilosec/Omeprazole. Dr.

20  Sislow informed plaintiff that this drug was contraindicated for individuals with Chronic Kidney

21  Disease (CKD). Dr. Sislow said he had also seen in plaintiff's medical file that plaintiff was stage

22

---

23  3  All medical procedures which entail contracting with an outside medical provider, or any treatment or
   medication which is above a particular cost set by the ODOC, requires approval by an ODOC medical services
24  committee. In plaintiff's case the TLC committee either refused to authorize the cost for 74 days, or plaintiff's
   condition and need for an MRI was not presented to the committee for 74 days.

1 four CKD.[4] Dr. Sislow further advised plaintiff to cease taking this drug immediately and to have

2 Dr. Beamer place plaintiff on a different drug to treat plaintiff's acid re-flux. Later that same day

3 plaintiff met with Dr. Beamer to review issues related to plaintiff's decreased kidney function.

4 Plaintiff again asked Dr. Beamer to take him off Prilosec/Omeprazole. Again, Dr. Beamer

5 refused, stating there was no reason to take plaintiff off the drug. Plaintiff informed Dr. Beamer

6 that this simply wasn't true, that he had read numerous articles, and heard on the news that

7 Prilosec was medically linked to decreased kidney function and even failure, particularly in

8 people who had been taking the drug long term. At this time plaintiff had been taking the drug

9 continuously for approximately 12 – 14 years. Dr. Beamer maintained that he knew nothing

10 about CKD being contraindicated with Prilosec/Omeprazole. Plaintiff then informed Dr. Beamer

11 that Dr. Sislow had advised plaintiff, earlier that same day, to discontinue the Prilosec

12 immediately. Dr. Beamer then went onto the Prilosec manufacturers website, using the exam

13 room computer, with plaintiff in the room. On the manufacturers website it was clearly stated;

14 *"Individuals with CKD should not take Prilosec."* Dr. Beamer then stated, "Well, you're right,

15 there it is. I had no idea. I guess you can go ahead and sue us." Dr. Beamer then discontinued

16 plaintiff's Prilosec. After discontinuing the Prilosec/Omeprazole, plaintiff's kidney function has

17 stabilized and appears to no longer be declining. In response to plaintiff's institution grievance,

18 ODOC's Medical Director, Christopher DiGiulio, stated, "In recent years scholarly studies have

19 shown a correlation between kidney disease and proton pump inhibitors, such as Omeprazole."

20 Followed by, "Your Omeprazole prescription has been discontinued..."

21       On October 19, 2019, plaintiff began the grievance process regarding Dr. Beamer's

22 refusal to discontinue Prilosec/Omeprazole which was contraindicated with plaintiff's CKD, by

23 _____

24 4  Plaintiff's kidneys were, and are functioning at approximately 20 percent of normal capacity. Anything less than
30 percent is considered stage four CKD, which is also referred to as stage four kidney failure. To put this in
context, kidney function below 15 percent is considered stage five, which requires dialysis and kidney transplant.

1 filing grievance #EOCI 2019-10-059. This process was not completed until after May 5th, 2020,

2 which is far beyond the 180 days allowed by statute to file notice of intent to file a tort claim for

3 damages. Plaintiff clearly indicated in his grievance that he intended to file a claim for damages

4 and that prior to filing his lawsuit plaintiff was required by the PLRA to exhaust his

5 administrative remedy. Defendant Sobotta intentionally slowed the grievance process which

6 caused the exhaustion of administrative remedies process to extend beyond the amount of time

7 legally available to plaintiff for satisfying the notice requirement. Grievance rules allow Sobotta

8 to terminate the grievance process when an inmate files a notice of intent to file a claim for

9 damages. Sobotta has previously indicated she would do this in the event plaintiff, or any other

10 inmate filed a notice of intent prior to completion of the grievance process. Plaintiff therefor

11 brings an interference claim against Sobotta for any damages that may be denied on the Prilosec

12 claim. ODOC medical director Christopher DiGiulio and Dr. Leland Beamer appear to have

13 admitted partial liability on the Prilosec claim.

14      Plaintiff has timely filed a notice of intent to file a claim for damages pursuant to ORS

15 30.275, regarding the events described herein. Timely notice was provided to the Department of

16 Administrative Services, Risk Management Division. Additional notice was provided to Jefry

17 Van Valkenburgh, General Counsel for the Oregon Department of Corrections (ODOC).

18 Plaintiff seeks monetary, declaratory, and injunctive relief. Timely notice was not provided on

19 the Prilosec/Omeprazole claim due to defendant Sobotta's interference in the processing of

20 grievance #EOCI 2019-10-059, which caused processing to extend beyond the 180 days allowed

21 by statute for providing notice.

22                                JURISDICTION

23      1. The court has jurisdiction over plaintiff's claims of violation of federal constitutional

24 rights under Title 42 U.S.C., sections 1331(a) and 1343, respectively.

1                              <u>PARTIES</u>

2        2. Plaintiff William M. Smith, SID. #6978452, was incarcerated in the ODOC in June,

3  2011. Plaintiff was an inmate incarcerated at EOCI during all events described herein. Plaintiff is

4  currently incarcerated at EOCI.

5        3. Defendant R. Conley, is and was at all times mentioned in this complaint, the Medical

6  Services Manager at EOCI. In this capacity Mr. Conley oversaw all of the Medical Services

7  provided to inmates at EOCI. This included reviewing and responding to inmate grievances

8  regarding medical services being denied to inmates. Mr. Conley is sued in both individual and

9  official capacities.

10        4. Defendant E. Purcell, is and was at all times mentioned in this complaint, the Nurse

11  Manager at EOCI. In this capacity Ms. Purcell manages the EOCI Health Services staff and is

12  charged with many additional administrative functions of Health Services operation. Ms. Purcell

13  ensures that Health Services staff follow all administrative rule guidelines and responds to

14  inmate grievances on behalf of Health Services staff. Defendant Purcell is sued in both

15  individual and official capacities.

16        5. Defendant Leland Beamer, was a former EOCI Health Services provider and was at all

17  times mentioned in this complaint, a doctor at EOCI. In this capacity Dr. Beamer was charged

18  with providing inmates at EOCI, health care that is commensurate with community standards of

19  care. In this capacity Dr. Beamer prescribed medications and treatments for inmates at EOCI and

20  made recommendations to the TLOC committee for inmates needing more expensive

21  treatments.[5] Dr. Beamer is sued in both individual and official capacities.

22

23  _____

24   5  EOCI Health Service providers are limited by cost, in what prescriptions and treatments they are allowed to
        order or prescribe for inmates. Any medication or treatment costing a substantial amount, or any type of surgical
        treatment, must receive approval from the TLOC committee prior to it's administration to the inmate.

1  6. Defendant Astorga, is and was at all times mentioned in this complaint, a Nurse

2  Practitioner at EOCI. In this capacity Ms. Astorga was charged with providing inmates at EOCI,

3  health care that is commensurate with community standards of care. In this capacity Ms. Astorga

4  prescribed medications and treatments for inmates at EOCI and made recommendations to the

5  TLOC committee for inmates needing more expensive treatments.[6] Ms. Astorga is sued in both

6  individual and official capacities.

7  7. Defendant Christopher DiGiulio, is and was at all times mentioned in this complaint,

8  the Medical Director of the Oregon Department of Corrections (ODOC). In this capacity Mr.

9  DiGiulio directs all medical and health service operations, and oversees all health service

10  operations in the various state prison facilities throughout the state, and helps develop the

11  policies used in providing health services to state inmates incarcerated in the ODOC. Defendant

12  DiGiulio is sued in both individual and official capacities.

13  8. Defendant Dr. Dewsnup, is and was at all times mentioned in this complaint, a Medical

14  Specialist who worked for EOCI and the ODOC diagnosing and treating inmates at EOCI. In this

15  capacity Dr. Dewsnup treated numerous inmates at EOCI for their Hepatitis C virus, prescribed

16  other HCV medications such as Ribavarin and monitored the progress and condition of the

17  inmates undergoing HCV treatment.

18  9. Defendant Davies, is and was at all times mentioned in this complaint, a Nurse

19  Practitioner at EOCI. In this capacity Ms. Davies was charged with providing inmates at EOCI,

20  health care that is commensurate with community standards of care. In this capacity Ms. Davies

21  prescribed medications and treatments for inmates at EOCI and made recommendations to the

22  TLOC committee for inmates needing more expensive treatments.[7] Ms. Davies is sued in both

23  individual and official capacities.

24
6  See above, footnote number 5.
7  See above, footnote number 5.

1  10. Defendant Sobotta, is and was at all times mentioned in this complaint, the

2  Grievance Coordinator at EOCI. In this capacity Ms. Sobotta runs the EOCI grievance office and

3  is charged with the processing, maintenance and archiving of all formal inmate grievances filed

4  with the office. Ms. Sobotta ensures that both inmates and staff follow all administrative rule

5  guidelines for filing and responding to institutional grievances and further ensures that the

6  process does not infringe upon the constitutional rights of inmates. When appropriate Ms.

7  Sobotta works directly with inmates to informally resolve problems at their lowest level.

8  Defendant Sobotta is sued in both individual and official capacities.

9  11. Sergeant John Doe I, is and was at all times mentioned in this complaint the East yard

10  Sergeant in charge of all basic security functions on the east side of the prison compound. In this

11  capacity Sergeant Doe supervises all Correctional Officers and Corporals working on the East

12  side of the prison and resolves any issues or matters arising between inmates, or between inmates

13  and staff, which may involve the orderly operation, safety and security of institution procedure

14  and function.

15  12. C.O. John Doe II, is and was at all times mentioned in this complaint a correctional

16  officer in charge of a particular zone of control within the institution. This includes the

17  supervision of various areas inhabited by inmates to ensure the orderly operation, safety and

18  security of institution procedure and function.

19  FACTS

20  13. In 2016 plaintiff underwent treatment for Hepatitis C Virus (HCV). Plaintiff was

21  given a drug called Harvoni for 12 (twelve) weeks. In addition to the Harvoni plaintiff was given

22  a second drug called Ribavarin.

23  14. After approximately 8 weeks of treatment with the drugs Harvoni and Ribavarin,

24  plaintiff was weak lightheaded and constantly on the verge of passing out. Plaintiff was sent to

1 EOCI's health services. Health Services staff determined plaintiff needed more serious attention

2 so plaintiff was transported to St. Anthony's hospital in Pendleton, Oregon. At the hospital

3 plaintiff was admitted and given a two unit blood transfusion.

4     15. Plaintiff was told that the Ribavarin he was taking had been destroying plaintiff's red

5 blood cells to the point where plaintiff was so weak, and low on blood, that the transfusion was

6 needed. Plaintiff asked Dr. Beamer if it was necessary to continue taking the the Ribavarin, and

7 was told no. It was further explained to plaintiff that the purpose of taking the Ribavarin was to

8 shift part of the detoxification process carried out by the liver, over to the kidneys. In effect, the

9 Ribavarin decreased the liver's workload while increasing the kidney's workload. In theory this

10 was supposed to help the liver clear the HCV.

11     16. Towards the end of plaintiff's HCV treatment plaintiff learned that another inmate

12 with the same HCV genotype as plaintiff, who was also on the Harvoni/Ribavarin combination

13 to treat his HCV, was receiving 33 percent less Ribavarin that plaintiff. This was a concern to

14 plaintiff because the amount of Ribavarin prescribed when used in combination with Harvoni to

15 treat HCV, is based entirely upon a person's body-weight. The inmate receiving 33 percent less

16 Ribavarin than plaintiff, weighed 60 pounds more than plaintiff. This would indicate that

17 plaintiff was being given an overdose of Ribavarin thereby creating an undue strain on plaintiff's

18 kidneys. At this time plaintiff was not aware of his decreased kidney function.

19     17. In 2017, plaintiff received a paper in the EOCI prison mail from medical staff which

20 indicated his most recent lab test had shown low kidney function.

21     18. After being informed of his low kidney function in 2017, plaintiff asked defendant

22 Beamer about his kidney function and was told by Dr. Beamer that "it was not a concern that he

23 (plaintiff) needed to worry about."

24

1     19. Plaintiff informed Dr. Beamer during a routine medical check-up in 2017, that he

2   wanted Dr. Beamer to discontinue his over-the-counter Prilosec medication (generic

3   Omeprazole) because plaintiff had heard on the Network News that Prilosec/Omeprazole had

4   been proven to cause a decrease in kidney function, particularly in patients who used the drug for

5   longer periods of time. At this time plaintiff had been taking Prilosec for approximately 12 years.

6   Defendant Beamer refused to discontinue plaintiff's Prilosec/Omprazole, stating to plaintiff that

7   there was no reason to discontinue it because he had not heard or seen any information to support

8   plaintiff's contention that long term Prilosec/Omeprazole use caused decreased kidney function.

9     20. In approximately 2018, plaintiff was told by the EOCI dentist, who was reviewing

10  plaintiff's medical chart prior to preforming a procedure, that plaintiff had stage three Chronic

11  Kidney Disease (CKD). This was the first information ever received by plaintiff indicating

12  that he was suffering from kidney *disease*.

13    21. Defendants intentionally with-held knowledge of plaintiff's CKD, from plaintiff, for a

14  period of several years, thereby denying plaintiff the opportunity to make appropriate lifestyle

15  changes in diet and exercise which could have slowed the diseases progression.

16    22. Defendants intentionally with-held knowledge of plaintiff's CKD, from plaintiff,

17  thereby causing plaintiff further harm in that plaintiff continued to ingest the drug Prilosec

18  (generic – Omeprazole) which has been shown to exacerbate kidney failure in people with CKD,

19  the drug is clearly contraindicated on the manufacturers website for people with CKD. As a

20  direct result of defendant's actions, plaintiff's CKD continued to grow worse, and did so at an

21  increased rate.

22    23. Plaintiff who suffers from severe acid re-flux disease and heartburn, stopped taking

23  the drug in spite of Dr. Beamer's advice, but soon found he was unable to eat without it.

24  Defendants gave plaintiff no reasonable alternative choice so plaintiff had to resume taking the

1 drug, plaintiff's kidney function continued to decrease at an alarming rate.

2     24. In December 2018, plaintiff was assaulted on his prison housing unit. The assault

3 involved a single punch commonly known as a "sucker punch" in which plaintiff did not even

4 see that the punch was thrown. The punch knocked out two of plaintiff's teeth, tore his upper lip

5 in half, and completely tore the right hemisphere of plaintiff's brain loose from the inside of his

6 skull.

7     25. Plaintiff requested immediate medical attention but security staff on the housing unit

8 refused to contact medical. Instead plaintiff was sent to the East Sergeant's Office.

9     26. Plaintiff again requested medical attention, and was again denied. Instead, plaintiff

10 was interrogated by the on duty Sergeant, John Doe I, as to who had assaulted him. Plaintiff

11 informed the Sergeant that he was merely requesting medical attention, that he had done nothing

12 wrong and was the victim of a unilateral assault. Plaintiff expressly told the Sergeant that he was

13 badly injured and that he felt his brain "sloshing around" the inside of his skull. Plaintiff was told

14 by Sergeant Doe I that plaintiff would not be receiving medical help if plaintiff did not first

15 identify the inmate who had assaulted him.

16     27. Plaintiff further told the Sergeant that if he wanted to know who had committed the

17 assault that the Sergeant should stop being lazy and look at the housing unit's video camera

18 footage. Plaintiff whose upper lip was completely ripped in half, was required to wait until the

19 Sergeant was able to identify the assailant.

20     28. Plaintiff was further told that if he withheld positive identification of his assailant he

21 would be going to the disciplinary segregation unit instead of going to health services for needed

22 medical treatment. Plaintiff was then escorted to EOCI's health services.

23     29. Plaintiff's injuries were so severe that he was taken to St. Anthony's hospital in

24 Pendleton, Oregon, where plaintiff received stitches to repair his lip, which had been torn

1 completely through.

2     30. When plaintiff initially complained of the injury to medical staff at EOCI, plaintiff

3 informed them that he had felt his brain "moving" and "sloshing around" inside his skull and was

4 experiencing a constant headache and ringing sound. Plaintiff expressly requested an MRI of his

5 brain. Plaintiff repeated this information to both the nurse and the doctor at St. Anthony's while

6 also telling the staff that the punch had enough force to spin plaintiff, who weighed 220 lbs., and

7 was standing flatfooted, completely around, 180 degrees. Plaintiff was initially denied an MRI.

8     31. Shortly after returning from the hospital plaintiff began experiencing a multitude of

9 problems which included a loss of balance, coordination, and core strength, which were

10 combined with memory and cognition problems. Within a week plaintiff's constant headache

11 grew worse and plaintiff began having trouble walking. In addition to balance and walking

12 difficulties plaintiff was unable to stop himself once he began walking. Initially, stopping

13 himself required that plaintiff grab onto something solid, such as a wall, door handle, or railing.

14     32. Plaintiff, who is not a doctor, and who had never experienced such symptoms, hoped

15 they would resolve on their own – they did not. The problems grew worse, plaintiff's constant

16 headaches became severe, sometimes progressing to migraine strength.[8]

17     33. Plaintiff had his unit officer call Health Services to request emergency treatment and

18 was told to submit a request to go to sick call, which plaintiff did. At sick call plaintiff requested

19 a brain MRI because he was experiencing severe neurological problems which plaintiff described

20 to the nurse, pointing out that plaintiff was also falling down frequently because he could not

21 control his body. Plaintiff was denied an MRI again.

22

23   8  In plaintiff's case he had to suffer through the headaches which were occasionally so severe plaintiff would be
completely incapacitated and not even able to get up off his bed. Due to plaintiff's Chronic Kidney Disease and

24 low kidney function, he was not able to take any of the normal OTC headache medicines that were readily
available, medications such as aspirin, Tylenol, or Ibuprofen.

1    34. The nurse at sick call did nothing and merely put in a referral for plaintiff to see a

2  nurse practitioner. The following week when  plaintiff saw nurse practitioner Astorga, his

3  symptoms had become even worse. Plaintiff complained to defendant Astorga, stating that there

4  was something seriously wrong with his brain, and that plaintiff needed an MRI.

5    35. The nurse practitioner, defendant Astorga, gave plaintiff some migraine headache

6  medication and told plaintiff that his severe neurological problems were likely being caused by a

7  sinus cold and that she would see him again in a month. Plaintiff was again denied an MRI.

8    36. During the following month plaintiff began falling down at a far greater rate of

9  frequency, usually several times each day. During this time period plaintiff estimates that he fell

10  approximately 150 times. Several times plaintiff fell on the steel stairs, or on the concrete/asphalt

11  in the East Compound. Plaintiff fell over while standing still dozens of times and fell off the edge

12  of his bunk while sitting, dozens of times. On one occasion plaintiff fell on the concrete

13  compound and was unable to get up of his own volition and had to be lifted into a wheelchair

14  and taken to medical. On another occasion plaintiff fell on the stairs, free-falling headfirst to the

15  landing below, however plaintiff was able to grab the railing near the bottom and catch himself.[9]

16    37. During this month plaintiff frequently found himself standing or walking in the

17  housing unit with no memory of what he was doing. Plaintiff was unable to watch TV because he

18  could not remember the plot of what he had just watched. When writing letters plaintiff had to

19  re-read each line that was just written, so he could remember what he had just written. Plaintiff's

20  handwriting, which was normally very clear and neat, became barely legible.

21    38. After suffering in this fashion for over two months, plaintiff was finally sent out to

22  Saint Anthony's hospital in Pendleton, Oregon, for a Magnetic Resonance Imaging (MRI) of his

23  _____

24
9  Had plaintiff not done this, plaintiff might have fractured his skull, or broken his neck, or possibly suffered a
    fatal injury. Even catching himself as he did, plaintiff tore the tendons or ligaments in his shoulder, and still
    suffers to this day from a painful torn rotator cup.

1 brain.

2     39. Upon review of the MRI, a CAT scan was immediately ordered by the staff at St.

3 Anthony's. Upon review of the CAT scan plaintiff was immediately admitted into the hospital.

4     40. Plaintiff was then transported via ambulance to Kadlec Medical Center in Richland,

5 Washington, was admitted into the intensive care unit (ICU), and then underwent emergency

6 brain surgery the following morning.

7     41. Kadlec neurologist, Dr. Beiber, informed plaintiff that plaintiff's brain had been torn

8 completely loose from the inside of his skull, and that plaintiff's brain had been slowly bleeding

9 continuously since the time of plaintiff's assault 74 days earlier.

10     42. The neurologist informed plaintiff that there was approximately twenty ounces of

11 blood, in various stages of coagulation on the right side of plaintiff's skull and that the pressure

12 on plaintiff's brain, which was essentially floating freely in the blood, had displaced the right

13 brain hemisphere approximately once inch to the left, smashing it into the left brain hemisphere.

14     43. The neurologist asked plaintiff why there had been no MRI done at the time of the

15 assault, stating that an MRI should have been done because a diagnostic MRI was the standard of

16 care for any severe head trauma. Plaintiff informed Dr. Beiber of the answer that he had been

17 given by Dr. Leland Beamer at EOCI, who stated that no MRI was done because the TLC

18 committee at EOCI had refused to approve the cost of an MRI.[10]

19     44. During the two and one-half month period prior to plaintiff's surgery, the EOCI

20 Health services staff had refused to provide plaintiff with the proper hypertension medication

21 needed to adequately control plaintiff's hypertension.

22

23 ————————————

10 All medical procedures which entail contracting with an outside medical provider, or any treatment or
medication which is above a particular cost set by the ODOC, requires approval by an ODOC medical services
24 committee. In plaintiff's case the TLC committee either refused to authorize the cost for 74 days, or plaintiff's
condition and need for an MRI was not presented to the committee for 74 days.

1    45. Dr. Beiber also told plaintiff that the prison's failure to adequately control plaintiff's

2    hypertension during the two and a half months immediately prior to plaintiff's brain surgery,

3    likely facilitated or was at least, a contributing factor, to plaintiff's 74 day brain bleed.

4    46. After surgery plaintiff had to remain in the ICU for several days while while a tube,

5    which had been inserted into plaintiff's skull, allowed his brain to continue draining blood.

6    47. During the entire time plaintiff was in ICU he was kept in body restraints, chained

7    around his torso, with hands cuffed and chained to his sides, and full ankle cuff restraints.

8    Plaintiff was unable to move, unable to bathe, and unable to even scratch an itch for the entire 5

9    days he was kept in ICU. Plaintiff was unable to sleep and describes this five days as literal

10   extreme torture.

11   48. Plaintiff underwent numerous CAT scans, and was required to undergo rehabilitation

12   therapy where plaintiff learned to walk again, and underwent therapy to realign plaintiff's optical

13   nerves with each hemisphere of his brain.

14   49. Plaintiff was told by Dr. Beiber that the right hemisphere of his brain would also be

15   "fragile", and prone to further serious injury if he received additional blows or injuries to the

16   skull.

17   50. In October of 2019, plaintiff was taken to Walla Walla, Washington, to see Dr.

18   Sislow, a Urologist, for a follow up PSA test and exam. During this visit Dr. Sislow told plaintiff

19   that he had seen on plaintiff's chart that plaintiff had been taking the drug Prilosec/Omeprazole.

20   Dr. Sislow informed plaintiff that this drug was contraindicated for individuals with Chronic

21   Kidney Disease (CKD). Dr. Sislow said he had also seen in plaintiff's medical file that plaintiff

22   was stage four CKD.[11]

23   _____

24   [11] Plaintiff's kidneys were, and are functioning at approximately 25 percent of normal capacity. Anything less than
     30 percent is considered stage four CKD, which is also referred to as stage four kidney failure. To put this in
     context, kidney function below 15 percent is considered stage five, which requires dialysis and kidney transplant.

1    51. Dr. Sislow further advised plaintiff to cease taking this drug immediately and to have

2    Dr. Beamer place plaintiff on a different drug to treat plaintiff's acid re-flux.

3    52. After meeting with Dr. Sislow plaintiff met with Dr. Beamer to review issues related

4    to plaintiff's decreased kidney function. Plaintiff again asked Dr. Beamer to take him off

5    Prilosec/Omeprazole. Again, Dr. Beamer refused, stating there was no reason to take plaintiff off

6    the drug. Plaintiff informed Dr. Beamer that this simply wasn't true, that he had read numerous

7    articles, and heard on the news that Prilosec was medically linked to decreased kidney function

8    and even failure, particularly in people who had been taking the drug long term. At this time

9    plaintiff had been taking the drug continuously for approximately 12 – 14 years.

10   53. Dr. Beamer maintained that he knew nothing about CKD being contraindicated with

11   Prilosec/Omeprazole. Plaintiff then informed Dr. Beamer that Dr. Sislow had advised plaintiff,

12   earlier that same day, to discontinue the Prilosec immediately. Dr. Beamer then went onto the

13   Prilosec manufacturers website, using the exam room computer, with plaintiff in the room. On

14   the manufacturers website it was clearly stated; *"Individuals with CKD should not take*

15   *Prilosec."* Dr. Beamer then stated, "Well, you're right, there it is. I had no idea. I guess you can

16   go ahead and sue us." Dr. Beamer then discontinued plaintiff's Prilosec/Omeprazole.

17   54. After discontinuing the Prilosec/Omeprazole, plaintiff's kidney function has stabilized

18   and appears to no longer be declining.

19   55. In response to plaintiff's institution grievance, ODOC's Medical Director, Christopher

20   DiGiulio, stated, "In recent years scholarly studies have shown a correlation between kidney

21   disease and proton pump inhibitors, such as Omeprazole." Followed by, "Your Omeprazole

22   prescription has been discontinued..."

23   56. On October 19, 2019, plaintiff began the grievance process regarding Dr. Beamer's

24   refusal to discontinue Prilosec/Omeprazole which was contraindicated with plaintiff's CKD, by

1 filing grievance #EOCI 2019-10-059, 2019-10-059A, 2019-10-059AA. This process was not

2 completed until after May 5, 2020, which is far beyond the 180 days allowed by statute to file

3 notice of intent to file a notice of tort claim for damages.

4    57. Plaintiff clearly indicated in grievance #EOCI 2019-10-059, 2019-10-059A, 2019-

5 10-059AA, that he intended to file a lawsuit to reclaim damages and that prior to filing his

6 lawsuit plaintiff was required by the PLRA to exhaust his administrative remedy.

7    58. Defendant Sobotta intentionally slowed the grievance process which caused the

8 process to extend beyond the amount of time legally available to plaintiff for timely filing the

9 tort claim notice requirement.

10    59. Defendant Sobotta terminates the grievance process when an inmate files a notice of

11 intent to file a claim for damages. Sobotta has affirmatively indicated she would do this in the

12 event plaintiff, or any other inmate filed a notice of intent prior to completion of the grievance

13 process.

14    60. Defendant Leland Beamer admitted he was negligent in continuing to prescribe

15 Omeprazole/Prilosec to plaintiff for two years after it was known within the health services

16 industry to decrease kidney function in patients suffering from CKD.

17    61. Defendant Christopher DiGiulio admitted that he and the ODOC Health Services staff

18 knew of the correlation between Omeprazole/Prilosec and decreased kidney function in patients

19 suffering from CKD.

20    62. Plaintiff's kidney function decreased as a result of Dr. Dewsnup prescribing Ribavarin

21 to plaintiff.

22    63. Plaintiff's kidney function decreased as a result of Dr. Beamer prescribing

23 Prilosec/Omeprazole for several years despite the Prilosec/Omeprazole's website expressly

24 directing that the drug not be given to people with CKD.

1    64. Plaintiff was needlessly placed at high risk of suffering additional severe injury or

2    death by defendant's refusal to provide adequate diagnosis and treatment of plaintiff's TBI

3    for a period of 74 days.

4    65. Plaintiff suffered extreme daily pain and neurological debilitation, needlessly for 74

5    days due to defendant's refusal to provide adequate diagnosis and treatment of plaintiff's TBI.

6    66. Plaintiff's 74 day brain bleed and consequent neurological symptoms were acerbated

7    by defendant's refusal to adequately control plaintiff's high blood pressure (HBP), between

8    December 17, 2018, and March 1, 2019.

9    67. Plaintiff's decline in kidney function was acerbated by defendants refusal to

10   adequately control plaintiff's HBP, between December 1, 2018, and March 30, 2019. EOCI

11   Health Services defendants were reprimanded by Dr. Thayer, a Nephrologist specializing in

12   kidney function, for failing to provide plaintiff with proper and adequate HBP medication.

13   68. As a result of defendant's refusal to provide adequate diagnosis and treatment of

14   plaintiff's TBI for a period of 74 days, Plaintiff has suffered minor permanent damage to his

15   cognitive function, memory, and balance, and severe permanent damage to plaintiff balance and

16   coordination for approximately 2 – 5 minutes after awakening from sleep.

17   69. Defendants Beamer, Davies and Astorga, refused to provide plaintiff with the proper

18   blood pressure medication, despite numerous requests from plaintiff to do so, between December

19   1, 2018 and March 30, 2019, which left  plaintiff's blood pressure uncontrolled and thereby

20   causing irreparable harm to plaintiff's kidneys, causing plaintiff to suffer pain associated with

21   symptoms of advanced CKD, a shortened lifespan  and putting plaintiff at needless risk of severe

22   injury, complete renal failure and death.

23   <u>CASE AND CONTROVERSY</u>

24   70. The facts described herein constitute an actual case and controversy between plaintiff

1 and defendants. Unless relief is provided by this court the case and controversy will continue and

2 plaintiff will continue to be irreparably harmed.

3 <u>CLAIMS FOR RELIEF</u>

4     71. The actions of defendants Conley, Purcell, Beamer, Astorga, DiGiulio, Dewsnup, and

5 Davies, under color of law, in contravention to the statutes and policies governing inmate health

6 care, when they knowingly, wantonly, and with deliberate indifference to plaintiff's serious

7 medical needs, intentionally refused to provide plaintiff with the proper diagnostic procedures

8 and medical treatment for a period of seventy-four (74) days after plaintiff had been the victim of

9 a unilateral assault which caused the right hemisphere of plaintiff's brain to be torn completely

10 loose from the inside of plaintiff's skull and further causing plaintiff's brain to bleed

11 continuously for seventy-four days resulting in plaintiff suffering severe and extreme physical

12 and mental debilitation which included constant headache, migraine headache, severe loss of

13 cognitive function, severe loss of motor function and balance thereby causing plaintiff to fall

14 down in excess of one hundred and fifty (150) times, causing plaintiff to occasionally operate in

15 a fugue state, causing additional bodily harm to plaintiff and putting plaintiff at continued and

16 needless risk of additional serious harm and possible death for seventy-four days, violated

17 plaintiff's right to be free from the infliction of cruel and unusual punishment as guaranteed by

18 the Eighth Amendment to the United States Constitution.

19     72. The actions of defendants Conley, Purcell, Beamer, Astorga, DiGiulio, Dewsnup, and

20 Davies, under color of law, in contravention to the statutes and policies governing inmate health

21 care, when they knowingly, wantonly, and with deliberate indifference to plaintiff's serious

22 medical needs, intentionally refused to provide plaintiff with the proper diagnostic procedures

23 and medical treatment for a period of seventy-four (74) days after plaintiff had been the victim of

24

1  a unilateral assault which caused the right hemisphere of plaintiff's brain to be torn completely

2  loose from the inside of plaintiff's skull and further causing plaintiff's brain to bleed

3  continuously for seventy-four days resulting in plaintiff suffering needlessly for a period of

4  seventy-four days and then having to undergo emergency brain surgery at Kadlec Medical center

5  in Richland, Washington, to stop the bleeding, drain approximately twenty ounces of blood from

6  the inside of plaintiff's skull and re-position the right hemisphere of plaintiff's brain, in which

7  plaintiff's life and continued well being was placed at risk, causing plaintiff to further suffer

8  extreme emotional distress and trauma associated with emergency brain surgery, including five

9  days in the intensive care unit during which time plaintiff suffered additional mental, emotional

10  and physical torture by being held constantly and continuously in full body chain restraints, arm

11  and leg shackles and cuffs,  violated plaintiff's right to be free from the infliction of cruel and

12  unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution.

13      73. The actions of defendants Conley, Purcell, Beamer, Astorga, and Davies, under color

14  of law, in contravention to the statutes and policies governing inmate health care, when they

15  knowingly, wantonly, and with deliberate indifference to plaintiff's serious medical needs,

16  intentionally refused to provide plaintiff with proper blood pressure medication to adequately

17  control plaintiff's high blood pressure, for a period of seventy-four (74) days after plaintiff had

18  been the victim of a unilateral assault which caused the right hemisphere of plaintiff's brain to be

19  torn completely loose from the inside of plaintiff's skull and thereby needlessly exacerbating

20  plaintiff's brain bleed for seventy-four days resulting in plaintiff suffering needless and extreme

21  debilitation[12] for a period of seventy-four days and then causing plaintiff to undergo emergency

22  brain surgery at Kadlec Medical center in Richland, Washington, to stop the bleeding, drain

23  approximately twenty ounces of blood from the inside of plaintiff's skull and re-position the right

24  _____

12 Debilitation is described in paragraph 71.

1 hemisphere of plaintiff's brain, in which plaintiff's life and continued well being was placed at

2 risk, causing plaintiff to further suffer extreme emotional distress and trauma associated with

3 emergency brain surgery, including five days in the intensive care unit during which time

4 plaintiff suffered additional mental, emotional and physical torture by being held in full body

5 chain restraints, arm and leg shackles and cuffs, violated plaintiff's right to be free from the

6 infliction of cruel and unusual punishment as guaranteed by the Eighth Amendment to the United

7 States Constitution.

8       74. The actions of defendants Conley, Purcell, Beamer, Astorga, DiGiulio, and Davies,

9 under color of law, in contravention to the statutes and policies governing inmate health care,

10 when they knowingly, wantonly, and with deliberate indifference to plaintiff's serious medical

11 needs, intentionally refused to provide plaintiff with proper blood pressure medication to

12 adequately control plaintiff's high blood pressure, for a period of four months, from

13 approximately December 1, 2018, through March 30, 2019, causing harm to plaintiff's kidneys in

14 that forcing plaintiff to undergo an extended period of time with blood pressure that was

15 uncontrolled placed needless undue strain on plaintiff's kidney's causing and or exacerbating

16 plaintiff's declining kidney function to further decline to a GFR of less than 30, stage four

17 Chronic Kidney Disease (CKD), from a GFR of greater than 30, stage three CKD, thereby

18 causing plaintiff to suffer additional symptoms associated with CKD, including but not limited

19 to, chronic joint pain, chronic kidney pain due to inflammation, chronic fatigue, a shortened

20 lifespan, and an increased risk of complete renal failure and death, violated plaintiff's right to be

21 free from the infliction of cruel and unusual punishment as guaranteed by the Eighth Amendment

22 to the United States Constitution.

23       75. The actions of defendants Conley, Purcell, Beamer, Astorga, DiGiulio, and Davies,

24 under color of law, in contravention to the statutes and policies governing inmate health care,

1 when they knowingly, wantonly, and with deliberate indifference to plaintiff's serious medical

2 needs, intentionally prescribed Prilosec/Omeprazole to plaintiff for a continuous period of

3 approximately nine years, including two years, from approximately Oct. 1, 2017, through Oct. 7,

4 2019, during which time plaintiff was diagnosed with Chronic Kidney Disease (CKD), and

5 defendants knew or should have reasonably known, that proton pump inhibitor drugs such as

6 Prilosec/Omeprazole are expressly contraindicated for individuals diagnosed with CKD, thereby

7 causing harm to plaintiff's kidneys in that the Prilosec/Omeprazole caused or exacerbated a

8 radical decrease in plaintiff's kidney function of approximately 20 to 50 percent, to a GFR of less

9 than 30, stage four Chronic Kidney Disease (CKD), from a GFR of greater than 30, stage three

10 CKD, thereby causing plaintiff to suffer additional symptoms associated with CKD, including

11 but not limited to, chronic joint pain, chronic kidney pain due to inflammation, chronic fatigue, a

12 shortened lifespan, and an increased risk of complete renal failure and death, violated plaintiff's

13 right to be free from the infliction of cruel and unusual punishment as guaranteed by the Eighth

14 Amendment to the United States Constitution.

15     76. The actions of defendant C.O. John Doe II, under color of law, in contravention to the

16 statutes and policies governing inmate health care, when he knowingly, wantonly, and with

17 deliberate indifference to plaintiff's serious medical needs, intentionally refused to provide

18 plaintiff with any medical care whatsoever, after plaintiff had been the victim of a unilateral

19 assault which caused the right hemisphere of plaintiff's brain to be torn completely loose from

20 the inside of plaintiff's skull and thereby needlessly exacerbating plaintiff's brain bleed for

21 seventy-four days resulting in plaintiff suffering needless and extreme debilitation[13] for a period

22 of seventy-four days and then causing plaintiff to undergo emergency brain surgery at Kadlec

23 Medical center in Richland, Washington, to stop the bleeding, drain approximately twenty

24 _____

13 Debilitation is described in paragraph 71.

1 ounces of blood from the inside of plaintiff's skull and re-position the right hemisphere of

2 plaintiff's brain, in which plaintiff's life and continued well being was placed at risk, causing

3 plaintiff to further suffer extreme emotional distress and trauma associated with emergency brain

4 surgery, including five days in the intensive care unit during which time plaintiff suffered

5 additional mental, emotional and physical torture by being held in full body chain restraints, arm

6 and leg shackles and cuffs, violated plaintiff's right to be free from the infliction of cruel and

7 unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution.

8      77. The actions of defendant Sgt. John Doe I, under color of law, in contravention to the

9 statutes and policies governing inmate health care, when he knowingly, wantonly, and with

10 deliberate indifference to plaintiff's serious medical needs, intentionally refused to provide

11 plaintiff with any medical care whatsoever, unless or until, plaintiff agreed to identify his

12 assailant, or agreed to help identify his assailant, after plaintiff had been the victim of a unilateral

13 assault which caused the right hemisphere of plaintiff's brain to be torn completely loose from

14 the inside of plaintiff's skull and thereby needlessly exacerbating plaintiff's brain bleed for

15 seventy-four days resulting in plaintiff suffering needless and extreme debilitation[14] for a period

16 of seventy-four days and then causing plaintiff to undergo emergency brain surgery at Kadlec

17 Medical center in Richland, Washington, to stop the bleeding, drain approximately twenty

18 ounces of blood from the inside of plaintiff's skull and re-position the right hemisphere of

19 plaintiff's brain, in which plaintiff's life and continued well being was placed at risk, causing

20 plaintiff to further suffer extreme emotional distress and trauma associated with emergency brain

21 surgery, including five days in the intensive care unit during which time plaintiff suffered

22 additional mental, emotional and physical torture by being held in full body chain restraints, arm

23 and leg shackles and cuffs, violated plaintiff's right to be free from the infliction of cruel and

24 _____

14 Debilitation is described in paragraph 71.

1  unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution.

2      78. The actions of defendant Sgt. John Doe I, under color of law, in contravention to the

3  statutes and policies governing inmate health care, when he knowingly, wantonly, and with

4  deliberate indifference to plaintiff's serious medical needs, intentionally refused to provide

5  plaintiff with any medical care whatsoever, unless or until, plaintiff agreed to identify his

6  assailant, or agreed to help identify his assailant, and further threatened to summarily place

7  plaintiff in the Disciplinary Segregation Unit if plaintiff refused to identify his assailant, after

8  plaintiff had been the victim of a unilateral assault which caused the right hemisphere of

9  plaintiff's brain to be torn completely loose from the inside of plaintiff's skull and thereby

10  needlessly exacerbating plaintiff's brain bleed for seventy-four days resulting in plaintiff

11  suffering needless and extreme debilitation[15] for a period of seventy-four days and then causing

12  plaintiff to undergo emergency brain surgery at Kadlec Medical center in Richland, Washington,

13  to stop the bleeding, drain approximately twenty ounces of blood from the inside of plaintiff's

14  skull and re-position the right hemisphere of plaintiff's brain, in which plaintiff's life and

15  continued well being was placed at risk, causing plaintiff to further suffer extreme emotional

16  distress and trauma associated with emergency brain surgery, including five days in the intensive

17  care unit during which time plaintiff suffered additional mental, emotional and physical torture

18  by being held in full body chain restraints, arm and leg shackles and cuffs, violated plaintiff's

19  right to be free from the infliction of cruel and unusual punishment as guaranteed by the Eighth

20  Amendment to the United States Constitution.

21      79. The actions of defendant Sobotta, under color of law, when she intentionally and

22  wantonly delayed the filing and processing of plaintiff's institutional grievance, number EOCI

23  2019-10-059, 2019-10-059A, and 2019-10-059AA, a grievance filed against defendants which

24  _____

15 Debilitation is described in paragraph 71.

1 alleged the deliberate indifference of defendants in their continued prescription and

2 administration of the drug Prilosec/Omeprazole, for a period of time in excess of 180 days,

3 thereby intentionally and wantonly preventing plaintiff from filing a timely notice of tort claim

4 thus creating interference to plaintiff petitioning the court for meaningful redress of grievances,

5 violated plaintiff's right to petition the court for redress of grievances in violation of the First

6 Amendment to the United States Constitution.

7      80. The actions of defendants Conley, Purcell, Beamer, Astorga, DiGiulio, Dewsnup, and

8 Davies, under color of law, in contravention to the statutes and policies governing inmate health

9 care, when they knowingly, wantonly, and with deliberate indifference to plaintiff's serious

10 medical needs, intentionally withheld from plaintiff for a period of several years, the fact that

11 plaintiff was suffering from and had been diagnosed with Chronic Kidney Disease (CKD),

12 thereby denying plaintiff the opportunity to make appropriate lifestyle changes in diet and

13 exercise which could have slowed the diseases progression, thereby causing further harm to

14 plaintiff's kidneys in that failing to make appropriate lifestyle changes contributed to an

15 accelerated decrease in plaintiff's kidney function from stage two Chronic Kidney Disease

16 (CKD), to stage three CKD, thereby causing plaintiff to suffer additional symptoms associated

17 with CKD, including but not limited to, chronic joint pain, chronic kidney pain due to

18 inflammation, chronic fatigue, a shortened lifespan, and an increased risk of complete renal

19 failure and death, violated plaintiff's right to be free from the infliction of cruel and unusual

20 punishment as guaranteed by the Eighth Amendment to the United States Constitution.

21      81. The actions of defendants Conley, Purcell, Beamer, and Dewsnup, under color of

22 law, in contravention to the statutes and policies governing inmate health care, when they

23 knowingly, wantonly, and with deliberate indifference to plaintiff's serious medical needs,

24 prescribed plaintiff an overdose of the drug Ribavarin which caused the destruction of a

1 substantial portion of plaintiff's red blood cells over a two month period in approximately

2 September and October of 2016, and thereby causing a radical decrease in plaintiff's kidney

3 function causing irreparable harm to plaintiff's kidneys in that plaintiff's kidney function

4 decreased by approximately 25 percent further causing plaintiff to suffer additional symptoms

5 associated with CKD, including but not limited to, chronic joint pain, chronic kidney pain due to

6 inflammation, chronic fatigue, a shortened lifespan, and an increased risk of complete renal

7 failure and death, violated plaintiff's right to be free from the infliction of cruel and unusual

8 punishment as guaranteed by the Eighth Amendment to the United States Constitution.

9 <u>RELIEF REQUESTED</u>

10 WHEREFORE, plaintiff requests that the court grant the following relief:

11 1. Issue a declaratory statement that defendants violated plaintiff's constitutional

12 rights as alleged herein;

13 2. Issue an injunction requiring defendant's, their agents, or any other ODOC personnel,

14 from committing any further acts of retaliatory harassment, including but not limited

15 to the transferring of plaintiff to any other ODOC facility;

16 3. Issue an injunction requiring defendants to implement policies consistent with existing

17 community standards of care in providing initial diagnostic MRI's to any individuals

18 presenting severe head trauma;

19 4. Issue an injunction requiring defendants to implement policies and procedures which

20 prohibit all security staff from withholding medical treatment as a means of extorting

21 assault victims into identifying their assailants and putting themselves at further risk

22 of harm;

23 5. Pay plaintiff $500,000.00 in compensatory damages for claims related to the damage to

24 plaintiff's kidneys;

1    6. Pay plaintiff $300,000.00 in compensatory damages for claims related to plaintiff's

2       traumatic brain injury;

3    7. Pay plaintiff $400,000.00 in total punitive damages;

4    8. Pay all fees and costs incurred throughout this action;

5    9. Any other relief deemed appropriate by the court.

6    I DECLARE under penalty of perjury that the foregoing is true and correct.

7

8    DATED this 29th day of June, 2020.

9

10

11

12    _William M. Smith_
      William M. Smith, SID. #6978452
13    Plaintiff Pro Se

14

15

16

17

18

19

20

21

22

23

24